### Ken BREWER, Plaintiff,

v.

### Carol PURVIS, Clarke County School District, William C. Fordham, Georgia High School Association, Hans C. Schacht, Chris Good, The Professional Practices Commission, Defendants.

Civ. No. 91–39–ATH(DF).

United States District Court,
M.D. Georgia,
Athens Division.

March 10, 1993.

---

Lawrence Scott McLarty, Athens, GA, Deedra M. Brewer, Austell, GA, for plaintiff.

Terrance C. Sullivan, Carol Awtrey Callaway, Rebecca S. Mick, Atlanta, GA, Edward Davison Burch, J. Ralph Beaird, Athens, GA, Alan W. Connell, Thomaston, GA, for defendants.

FITZPATRICK, District Judge.

Defendants' motions for summary judgment are presently pending in this Court. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For purposes of a summary judgment motion, the non-movant's version of the facts must be accepted, and all disputed matters must be resolved in favor of the non-movant. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Summary judgment, however, is mandated, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## BACKGROUND

Plaintiff Ken Brewer was employed by the Clarke County School District ("CCSD") as the head football coach and as a teacher at Cedar Shoals High School ("CSHS") from the spring of 1986 until the April of 1990.[1] On April 12, 1989, Plaintiff signed a contract of employment as a member of the CSHS

---

1. Purvis Deposition, p. 98.

teaching staff for the scholastic year 1989–90, which called for a $27,167.00 annual salary. On July 20, 1989, the Personnel Director of CCSD issued a personal information indicating that Brewer would receive a salary supplement of $7,400.00 for serving as head football coach during the 1989–1990 season.[2]

CSHS is a member of the Georgia High School Association ("GHSA"). The GHSA is a voluntary association of 355 public and private high schools organized to promulgate and enforce uniform rules of eligibility and play between its members[3]. Schools are required to determine and certify eligibility rules for competing students to the GHSA. One of the academic eligibility rules promulgated and enforced by the GHSA is the requirement that a student be "on track" for graduation before he/she can participate in athletics. The "on track" provision was enacted by the State Board of Education in July of 1987, effective for the 1987–88 school year and was adopted in October 1988 by the GHSA Executive Committee[4], which included CSHS's athletic director.[5] In order to be "on track" a student in his third year of high school must have passed and received credit for ten (10) units before he is eligible to participate in interscholastic competitions.[6] The Clarke County School District's "no pass/no play" rule is identical to the GHSA's rule.[7]

Football practice began on August 1, 1989. Coach Glen Townsend, who was responsible for determining student eligibility, prepared a list of all players desiring to participate in varsity football and checked the school records to determine whether those students were eligible. J.C.'s grades at CSHS were as follows:

**1987–1988 School Year**

| | |
|---|---|
| English I | 48/F |
| Math I | 62/F |
| Physical Science | high 60s/F |
| World Geography | mid–50's/F |
| Art | 77/C |
| Health and Physical Education | 77/C |

**1988–1989 School Year**

| | |
|---|---|
| Math I | 52/F |
| Math II | 72/C |
| Biology | 58/F |
| World History | 77/C |
| Building and Construction Technology I | F |
| Physical Education | 85/B |

**Summer of 1989**

| | |
|---|---|
| Biology | 77/C |
| General Math | 75/C |

Since J.C. had passed only seven subjects during his first two years of high school, he was ineligible to play varsity football, and he did not participate in football practice on August 1, 1989.[8] Coach Townsend told Coach Brewer that J.C. was ineligible.

The week before football practice began, J.C.'s father visited Charles Worthy, Associate Principal at CCHS. J.C.'s father indicated his desire to have J.C. play football and his concern that J.C. might not remain in school if he were not permitted to play. J.C.'s father had previously talked to Coach John Osborne, who taught handicapped students at CCHS, about J.C.'s academic problems.[9] Coach Osborne surmised that J.C. might have a learning disability and arranged for J.C. to be tested. Coach Brewer called the GHSA and asked if J.C.'s placement in special education would automatically make him eligible.[10] Mr. Fordham informed Mr. Brewer that special education placement had no effect on eligibility.[11]

Coach Osborne contacted Mr. David Schwartz and asked if he would test J.C. After Mr. Schwartz agreed to do so, Mr.

2. Affidavit of Herbert Stroud ("Stroud Affidavit") in Support of CCSD's Motion for Summary Judgment, Exhibit B.

3. Affidavit of William C. Fordham at ¶ 1.

4. GHSA By-law § 1.55.

5. Second Fordham Affidavit at ¶ 3.

6. Fordham Affidavit at ¶ 3.

7. Stroud Affidavit in Support of CCSD's Motion for Summary Judgment, Exhibit D.

8. Stroud Affidavit, Exhibit D.

9. Professional Practice's Commission ("PPC") Hearing, Testimony of John Osborne at 362.

10. PPC Hearing, Testimony of Ken Brewer, p. 886.

11. Id.

Osborne called J.C.'s father and gave him Mr. Schwartz's name. J.C.'s father then contacted Mr. Schwartz and made an appointment for J.C. for Saturday, August 26, 1989.[12] That evening, Mr. Schwartz informed Coach Osborne that J.C. had a learning disability.[13] Coach Osborne then advised some of J.C.'s teachers about the test results. Eventually four of J.C.'s grades were changed.[14] J.C. was declared eligible for football on August 30, 1989, and practiced football that day.

In the early fall of 1989, GHSA was notified by the State Department of Education of a possible violation of eligibility rules by CSHS, i.e., that the grades of a Cedar Shoals student athlete, J.C., had been changed to make the student eligible to play football.[15] On November 1, 1989, Chris Good, an investigator for the Professional Practices Commission [16] ("PPC"), received a telephone call from Mr. Randall Ponder, who was the administrator in charge of No Pass/No Participate. Mr. Ponder informed Mr. Good that he had received a report of violations of the No Pass/No Participate rule at CSHS and that he and Regional Director Jim Gurley were going to Cedar Shoals on November 7, 1989, to begin an investigation. Mr. Ponder asked Mr. Good to accompany them.

On November 7, 1989, Good, Gurley and Ponder visited CSHS.[17] While visiting CCHS, Chris Good spoke with Plaintiff for approximately five minutes.[18] On the same day, Gurley and Ponder visited Dr. Purvis and informed him of their investigation.[19] The next day Dr. Purvis met with Mr. Doug McLaughlin, the principal of CSHS, regarding the grade changing incident.

On November 8, 1989, Mr. Fordham called Mr. Good to inform him that the GHSA would hold a hearing on November 9, 1989, on the allegations of GHSA's regulations by CSHS. Mr. Fordham granted Mr. Good's request to attend as an observer for informational purposes. Although the PPC did not receive a written request to conduct an investigation into the grade changing incident until November 13, 1989 [20], it instigated an official investigation on November 9, 1989 [21], which involved one or more interviews with approximately twenty-five people.[22]

On November 9, 1989, Coach Brewer observed Chris Good talking with Mr. Alan Connell, attorney for the GHSA, and William Fordham before the GHSA hearing began.[23] During the hearing Coach Brewer testified that he had no interest or knowledge of any grade changes involving J.C. Mr. Connell

12. Id., Testimony of John Osborne at 366–369.

13. Mr. Schwartz's evaluation said that J.C. had a reading disability. PPC Hearing, Testimony of Nancy Conger, p. 609. J.C. was eventually rejected for special education placement. Id. at 615.

14. J.C.'s grades in Math, Physical Science, World Geography and Construction were changed. See PPC Hearing at 259–260, 305, 482–483, 509. There is a lack of consensus among the various Defendants as to how many of these changes were improper. See Exhibit C to GHSA's Motion for Summary Judgment (three); Response of Carol Purvis to Plaintiff's Requests for Admission, Nos. 39 & 40 (two); PPC Investigative Report (four).

15. Nancy Conger, who is in charge of special education referrals at CCHS, testified that she made an anonymous phone call at the end of October 1989. PPC Hearing at 634, 646.

16. The PPC is an agency of the State of Georgia authorized to investigate alleged violations of rules, regulations, or policies of the state board, the commission or a local board by an educator. O.C.G.A. § 20-2-796(a)(1)–(4).

17. PPC Hearing, Testimony of Chris Good, p. 694.

18. Id. at 698.

19. PPC Hearing, Testimony of Carol Purvis, p. 136.

20. PPC Hearing, Respondent's Exhibit No. 6. The letter from Dr. Hall Rogers, Associate State Superintendent, though dated November 8, 1989, is stamped "Received November 13, 1989." Chris Good testified that Mr. Ponder told him when they left CSHS on November 7, that he would receive a referral the next day. Id. at 855.

21. Chris Good testified that he was conducting a "preliminary" investigation on behalf of the PPC at the invitation of the State Board of Education when he visited CSHS on November 7, 1989. PPC Hearing at 852.

22. Stroud Affidavit, Exhibit "E". The first day "official" interviews were conducted at CSHS was November 13, 1989.

23. Affidavit of Ken Brewer, dated August 14, 1992, ¶ 12.

turned and asked Mr. Good if Coach Brewer had indicated the same in the earlier interviews. Mr. Good replied that Coach Brewer told him that Coach Osborne had approached him and said "Here's the deal. I've talked to all the teachers. I think they understand. It wouldn't hurt for you to talk to them."

After the evidentiary hearing William Fordham made the following fact findings and assessed the following penalties:

> In view of the fact that (1) only three courses were needed to gain eligibility and only three grades were changed; (2) two of the three teachers who changed grades were football coaches and all three acted after a request for review by Coach Osborne; (3) the action taken by Coach Osborne is not such action as he customarily took on behalf of all other students; (4) no one could recall a similar case where grades were changed after a two-year period; (5) no make up work or supplemental work was performed by the student prior to the grade change; (6) all three grades were changed within a two day period; (7) the student was, on the same day that the grades were changed, immediately certified to the GHSA as eligible; and (8) Coach Osborne had a conversation with Coach Brewer indicating that eligibility for football was considered in the action taken by Coach Osborne, I must conclude that the actions taken by the Cedar Shoals personnel were for the purposes of improperly securing eligibility for the student to play football. These actions are in violation of the GHSA Constitution Art IV Section 14 and GHSA Bylaws Section 2.31b. Cedar Shoals is hereby required to:
>
> (1) forfeit any games won during the 1989–90 school year in which the subject student participated;
>
> (2) be on probation for one calendar year from the date of the ruling;
>
> (3) pay a $1,000.00 fine.[24]

William Fordham forwarded his ruling to Dr. Carol Purvis, Superintendent of the Clarke County School District. Neither the GHSA nor any other person acting on its behalf released a copy of the decision to anyone other than Superintendent Purvis. GHSA did not announce its decision and all inquiries were directed to Superintendent Purvis.[25]

CSHS subsequently appealed the decision to the GHSA State Board of Appeals, which unanimously upheld the Executive Director's decision.[26] CSHS did not exercise its right to appeal the decision to the full GHSA Executive Committee.[27] On November 13, 1989, a CCSD Internal Task Force was formed at the direction of the Clarke County School Board to investigate grade-changing, eligibility requirements, including the no-pass/no-participate policy and the screening process for special education students in the CCHS. The CCSD Internal Task Force completed its investigation on December 15, 1989, and found that while things at the three middle schools and CCHS generally were in good shape, grade-changing/grade-correction at CCHS was not. Dr. Purvis received the Task Force's report. on January 5, 1990.[28]

On November 14, 1989, Mr. Hans Schacht, Executive Director of the PPC, and Mr. Good visited Dr. Purvis to inform him of the PPC investigation. During the meeting, Schacht advised Dr. Purvis that it would be "improper for Purvis or the Clarke County Board of Education to investigate the grade changing situation" since CCSD had a "legal arm of the state who was doing the investigating" and that any local investigation should be put on hold.[29]

On January 23, 1990, Mr. Schacht advised Dr. Purvis of the PPC Executive Committee's finding that probable cause existed to believe that Plaintiff had committed an act or acts warranting the suspension of his teaching certificate. On January 24, 1990, Dr. Purvis telephoned Mr. Chris Good and asked for clarification concerning the PPC Executive Committee's findings and recommendation.

On February 1, 1990, Mr. Schacht presented the PPC's investigative report to the

---

24. Fordham Affidavit, Exhibit C.

25. Fordham Affidavit at ¶ 9.

26. Fordham Affidavit at ¶ 10.

27. Id.

28. Affidavit of Dr. Purvis, ¶ 8.

29. Purvis Deposition, dated January 17, 1991, pp. 26–27.

CCSD in an open meeting attended by the media.[30] In the report Mr. Schacht recommended that Coach Brewer's teaching certificate be suspended for two years. Schacht also instructed the board to "use the report for study, deliberation, and to make decisions about employees and their contract tenure that are ethically and legally defensible."[31] Schacht was quoted in the local newspaper as telling the school board and public that the reason he gave the local school system the report was because they might not be able to enforce its no pass/no play policy since it was invalid.[32]

On February 6, 1990, the CCSD Internal Task Force presented its written report to the CCSD in an open meeting.[33] Based on the GHSA's ruling, the PPC investigation, and the CCSD's Internal Task Force Report, Dr. Purvis decided to recommended that Plaintiff be relieved of his duties as Head Football Coach.[34] On February 8, 1990, the Clarke County Board of Education, without holding a hearing, voted to relieve Plaintiff of his responsibilities as Head Football Coach at Cedar Shoals to be effective immediately.[35] Neither Defendant Purvis nor the Clarke County School System investigated the allegations of improper grade changes before the decision was made to relieve Brewer of his coaching position.[36] Rather, the incident was investigated many months later.[37]

Brewer was absent from work 29 times from February 9 until March 23, 1990.[38]

Many parents and school board members contacted Dr. Purvis about Mr. Brewer's absenteeism.[39] On March 15, 1990, Brewer, suffering stress and public humiliation, requested a leave of absence from Superintendent Purvis through his attorney.[40] Purvis received a copy of the letter confirming his permission to take the leave of absence but did not respond to it.[41] On March 22, 1990, the Clarke County Board of Education unanimously voted to deny Brewer's request for a leave of absence.[42] The CCSD did not provide Brewer a pre-termination hearing.

On March 22, 1990, the CCSD discovered that in September 1989, Dr. Tina Upchurch, Director of Special Education, had informed Elizabeth Ireland, the Associate Superintendent of Clarke County School District, about the changes in J.C.'s grades and that Dr. Ireland had not taken any action. Although Dr. Purvis learned that his office had been informed of the grade changes in November 1989, he chose not to divulge this information to the School Board.[43] Both Dr. Ireland and Dr. Purvis subsequently received letters of reprimand.[44]

On March 26, 1990 Brewer submitted a letter of resignation, effective April 2, 1990, to the CCSD after he received a phone call from Dr. Purvis informing him he could either return to work, in which case he would not be fired, not return to work and be fired or he could submit his resignation.[45]

---

30. Purvis Affidavit at ¶ 11.

31. Exhibit "D" to Plaintiff's Opposition to PPC's Motion for Summary Judgment.

32. In *Kitchens v. State*, 198 Ga.App. 284, 401 S.E.2d 552 (1991), the Georgia Court of Appeals held that state school policy, including the no pass/no play rule was invalid because it had not been promulgated by the Administrative Procedure Act.

33. Purvis Affidavit, ¶ 12.

34. Purvis Affidavit, ¶ 12.

35. Stroud Affidavit, Exhibit "H".

36. PPC Hearing, Testimony of Carol Purvis, p. 142.

37. Id.

38. Purvis Deposition, Exhibit C.

39. Purvis Affidavit, ¶ 13.

40. Affidavit of Ken Brewer, dated February 14, 1990.

41. Deposition of Carol Purvis, dated August 30, 1991, p. 94.

42. Purvis Deposition, p. 92–93.

43. Exhibit C to Plaintiff's Brief in Support of Motion for Reconsideration of Plaintiff's Motion to Compel; Clark County School District's Response to Plaintiff's First Interrogatories No. 17; PPC Hearing, Testimony of James Harris, p. 338; Testimony of Elizabeth Ireland, at 802–806.

44. Purvis Affidavit, ¶ 18.

45. Deposition of Ken Brewer, p. 101; Purvis Affidavit at ¶ 14.

Prior to September 1990, Don Farmer of WSB–TV in Atlanta, Georgia, interviewed William Fordham as part of a feature story on Georgia high school athletics. In the interview, which was aired in September of 1990, Fordham made the following statements:

Farmer: Did [Brewer] foul up?

Fordham: Yeah, he fouled up, he fouled up.

Farmer: [Brewer] claims he didn't know, he had nothing to do with working on eligibility.

Fordham: You sit here and have him call you day in and day out though; he better have something to do with it, he better know.

Farmer: In other words, if he didn't know, he should have known.

Fordham: He should have known.[46]

On June 25-27, 1991, a PPC Hearing Tribunal convened. Mr. Brewer was present and represented by counsel. The Tribunal concluded that Plaintiff committed "an act or acts constituting other good and sufficient cause" within the meaning of the rules of the PPC so as to justify disciplinary action against Mr. Brewer's teaching certificate.[47]

## DISCUSSION

Plaintiff contends that the Defendants violated his right to equal protection and his due process rights under the Constitution of the United States and the Georgia Constitution by depriving him of his property interests in his coaching and teaching positions and of his liberty interest in his reputation. Plaintiff also claims that he was libeled by the Defendants.

## FEDERAL LAW CLAIMS

### I. EQUAL PROTECTION

Defendant Purvis has moved for summary judgment on Plaintiff's equal protection claim. Plaintiff conceded this claim by his failure to respond Defendant's motion on this issue. Consequently, Defendant Purvis' motion for summary judgment on Plaintiff's equal protection claim is GRANTED.[48]

### II. DUE PROCESS DEPRIVATION OF PROPERTY

■ The language of 42 U.S.C. § 1983 does not create substantive rights; rather, it merely provides remedies for deprivation of rights established elsewhere. *Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985). In order to sustain a cause of action under section 1983, a plaintiff must show that the defendant deprived him of a right secured by the Constitution or the laws of the United States and that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988).

#### A. PPC, Schacht and Good

Plaintiff contends that the PPC's recommendation that Plaintiff's teaching certificate be suspended for two years deprived him of his property interest without due process of law. Defendants argue, however, that Plaintiff's lawsuit is barred under the Eleventh Amendment. Defendants Schacht and Good further contend that they are entitled to summary judgment on the basis of qualified immunity.

##### 1. Eleventh Amendment Immunity

■ The Eleventh Amendment states: "[t]he Judicial power to the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.[49] The amendment "is a specific constitutional bar against hearing even *federal* claims that otherwise would be within the jurisdiction of the federal courts. *Pennhurst State Sch. & Hosp. v. Halderman,* ("Pennhurst II"), 465 U.S. 89, 120, 104 S.Ct. 900, 919, 79

---

46. Fordham Affidavit at ¶ 13.

47. Stroud Affidavit, Exhibit "D".

48. The Court notes that the record is devoid of any evidence that would support an equal protection claim.

49. The Eleventh Amendment also bars suits against a state by its own citizens. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

L.Ed.2d 67 (1984) (emphasis in original). The bar is present "even when a state is not named as a party of record, if for all practical purposes the action is against the state." *Schopler v. Bliss,* 903 F.2d 1373, 1378 (11th Cir.1990).

Eleventh Amendment immunity may be waived, however, by explicit Congressional enactment or a state may consent to be sued in federal court. *Robinson v. Georgia Dept. of Transp.,* 966 F.2d 637, 640 (11th Cir.1992). In *Quern v. Jordan,* the Supreme Court held that Congress did not abrogate states' eleventh amendment immunity when it enacted 42 U.S.C. § 1983. 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979). Thus, the PPC's, Good's and Schacht's eleventh amendment immunity has not been abrogated by Congress. The Court further concludes that Georgia has not waived its Eleventh Amendment immunity.

Suits against state agencies seeking monetary damages are considered as suits against the state itself. *See Employees of Dept. of Public Health and Welfare, Missouri v. Dept. of Public Health and Welfare, Missouri,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). Plaintiff, however, argues that the PPC and Defendants Schacht and Good in their official capacities should not be barred because Georgia has waived its immunity by purchasing a $5,000,000 state employee liability policy. A state's Eleventh Amendment immunity is waived only if it unequivocally indicates that it "intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 3145 n. 1, 87 L.Ed.2d 171 (1985). Therefore, waiver

will not be found unless "stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Fouche v. Jekyll Island–State Park Authority,* 713 F.2d 1518, 1522 (11th Cir.1983).

The Georgia Constitution states in relevant part:

> Sovereign immunity extends to the state and all of its departments and agencies.... [T]he defense of sovereign immunity is waived as to those actions for the recovery of damages for any claim against the state of any of its departments and agencies for which liability insurance protection for such claims has been provided but only to the extent of any liability insurance protection provided. No waiver of sovereign immunity shall be construed as a waiver of immunity provided to the state or its departments and agencies provided by the United States Constitution.

GA. CONST. Art. 1, § 2, ¶ 9 (1983) [50] (emphasis added). As the last sentence indicates, although Georgia waived its sovereign [51] immunity and consented to be sued in its own courts when liability insurance was present, it specifically reserved its Eleventh Amendment immunity. Therefore, since the state has not waived its immunity, this Court does not have subject-matter jurisdiction over the claims against the PPC.[52] The Court next turns to the question of whether Defendants Schacht and Good are entitled to Eleventh Amendment immunity.

Eleventh Amendment immunity applies to suits against officials in their official capacities. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79

---

**50.** This section of the Georgia Constitution was amended in 1991, to delete provisions that waived Georgia's sovereign immunity when liability insurance was present. The amendment, however, is inapplicable because the conduct, which gave rise to Plaintiff's claims, occurred in 1989 and 1990. *See Curtis v. Bd. of Regents,* 262 Ga. 226, 416 S.E.2d 510 (1992) (waiver not withdrawn by passage of 1991 amendment). Even if the amendment were applicable the result would be the same since the provision reserving Eleventh Amendment immunity was preserved.

**51.** Sovereign immunity and eleventh amendment immunity are two distinct concepts. *Karpovs v.*

*State of Mississippi,* 663 F.2d 640, 645 (5th Cir. 1981). A waiver of sovereign immunity does not dictate a waiver of Eleventh Amendment immunity. *Id.*

**52.** The Plaintiff argues that these Defendants obviously were comfortable with this Court's subject-matter jurisdiction because Defendants removed this case to federal court. While Plaintiff is correct that these Defendants agreed to the removal, subject-matter jurisdiction cannot be waived. *See, e.g., Owens Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978)

L.Ed.2d 67 (1984). It does not preclude an award of damages against defendants sued in their personal or individual capacities. *Hafer v. Melo,* — U.S. —, —, 112 S.Ct. 358, 364–65, 116 L.Ed.2d 301 (1991); *Gamble v. Florida Dept. of Health & Rehab. Services,* 779 F.2d 1509, 1512 (11th Cir.1986). Plaintiff's Complaint does not specify whether he is suing Schacht and Good in their official or individual capacities or both.[53] Frequently, a complaint will not indicate whether the defendants are sued in their individual capacities, official capacities or both. *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985). Nonetheless, " 'the course of [the] proceedings' typically will indicate the nature of the liability sought to be imposed." *Id.* (citation omitted).

▬ The Eleventh Amendment protects Good and Schacht if Plaintiff "is reasonably seeking relief from the state coffers." *Gamble,* 779 F.2d at 1513. In arguing that Defendants waived their Eleventh Amendment immunity the Plaintiff stated "Georgia's fiscal integrity will remain intact due to its insurance protection." [54] Thus, since Plaintiff is seeking to have any potential judgment satisfied by the State, Plaintiff is suing Schacht and Good in their official capacities. Consequently, Schacht and Good also are entitled to Eleventh Amendment immunity in their official capacities.[55] Unfortunately, this conclusion raises troubling issues for the Court, which have not been addressed by any of the parties.

### 2. Subject Matter Jurisdiction

▬ The Eleventh Amendment is a specific limitation on the grant of jurisdiction under Article III of the United States Constitution. *Hobbs v. Georgia Dept. of Transp.,* 785 F.Supp. 980 986 n. 10 (N.D.Ga.1991). This case was removed to this Court on March 20, 1991. Plaintiff's motion to remand,[56] which was denied, was opposed by all the Defendants. Consequently, the state Defendants' Eleventh Amendment immunity defense raises the issue of a lack of subject matter jurisdiction.

▬ Under 28 U.S.C. § 1441 only civil actions that are within the original jurisdiction of the district Court may be removed. *McKay v. Boyd Const. Co. Inc.,* 769 F.2d 1084, 1067 (5th Cir.1985). The phrase "civil action" means "the entirety of the proceedings in question, not merely" claims or parties. *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1376 (5th Cir.1980). A district court must remand a case if it discovers, at any time prior to final judgment, that it lacks subject matter jurisdiction. 28 U.S.C. § 1447. Undoubtedly, the claims against the PPC and Schacht and Good in their official capacities were improperly removed. The question is whether, in light of § 1441 and 1447(c), a state defendant's Eleventh Amendment immunity defense completely divests this Court subject-matter jurisdiction even when other federal claims against other defendants are present such that the entire action must be remanded to the state court.

In *McKay* a plaintiff sued a state highway department and a private contractor for negligence. The Fifth Circuit concluded that the case had been improperly removed because the state had Eleventh Amendment immunity, and therefore, the presence of the state as a codefendant required that the action against the private contractor also be remanded. The Court concludes that the present case is distinguishable from *McKay*.

▬ The Supreme Court has indicated that the Eleventh Amendment jurisdictional bar acts to preclude individual claims rather than entire cases. *Henry v. Metropolitan*

---

53. Although courts may consider the caption of a case as a factor in determining whether a defendant has been sued personally or in his official capacity, *see Lundgren v. McDaniel,* 814 F.2d 600, 604 n. 2 (11th Cir.1987), the caption in the present case does not indicate one way or the other.

54. Plaintiff's Brief in Opposition to Defendant's Hans J. Schacht, Chris Good, and the Professional Practice Commission Motion for Summary Judgment, p. 13.

55. The Court does not reach Good and Schacht's contention that section § 1983 suits may not be pursued against a state officials in their official capacities, *Will v. Michigan Dept. of Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed. 45 (1989), since it has concluded the two are entitled to Eleventh amendment immunity.

56. Plaintiff did not argue that the Eleventh Amendment was a jurisdictional bar to the removal.

*Sewer Dist.*, 922 F.2d 332, 338 (6th Cir.1990); *but see Simmons v. State of Cal., Dept. of Indus. Rel.*, 740 F.Supp. 781, 786 (E.D.Cal. 1990) (removal improper as to all defendants despite presence of federal questions when Eleventh Amendment immunity present). In *Pennhurst II*, which held that pendent jurisdiction cannot override the protection of the Eleventh Amendment, the Supreme Court stated "[a] federal court must examine each *claim* in a case to see if the court's jurisdiction over that *claim* is barred by the Eleventh Amendment." 465 U.S. at 121, 104 S.Ct. at 919 (emphasis added). Therefore, the Eleventh Amendment "presents a jurisdictional bar to claims, not to entire cases which involve claims implicating the eleventh amendment." *Henry*, 922 F.2d at 337; *see Roberts v. College of the Desert*, 870 F.2d 1411, 1415 (9th Cir.1988) ("even if the [state defendant] is shielded from suit by the state's sovereign immunity, we have jurisdiction to consider the merits of [the plaintiff's] appeal because she could still recover from the individual defendants in their individual capacity.") Consequently, "to the extent that *McKay* forecloses consideration of claims unaffected by the eleventh amendment in favor of remand pursuant to 28 U.S.C. § 1447(c), [this Court] rejects as fundamentally incompatible with ... *Pennhurst II*." *Henry*, at 339.

■ Thus, the Court concludes that it need not remand the entire case to the state court. Rather the Court, according to *Pennhurst II*, may limit its remand to the claims against the PPC and Defendants Schacht and Good in their official capacities.[57] *See Roberts*, 870 F.2d at 1415. Accordingly, the claims against the PPC and Schacht and Good in their official capacities are RE-MANDED to the Clarke County Superior Court.

■ The Court now turns to Plaintiff's claims against Good and Schacht in their individual capacities. If a plaintiff seeks to "proceed against the officer only because he acted without proper authority, the judgment may not compel the State to use its funds to compensate the plaintiff for the injury." *Florida v. Treasure Salvors, Inc.*, 458 U.S. 670, 689, 102 S.Ct. 3304, 3317, 73 L.Ed.2d 1057 (1982). Thus, any allegation that Defendants Schacht or Good exceeded their authority is subject to a qualified immunity, rather than an Eleventh Amendment immunity, defense.[58] The difficulty is determining which claims are against the individual Defendants in their individual capacities.[59]

A review of the Complaint shows that Plaintiff makes a number of allegations that Schacht, Good and the PPC together acted in an arbitrary and capricious manner, with malice and in bad faith.[60] This is not an individual capacity claim. Paragraph 32, which alleges that Defendant Good acted outside his statutory authority when he testified at the GHSA hearing,[61] is the only paragraph which appears to specifically allege an individual capacity claim. The Court hesitates to address the issue of qualified immunity until the Plaintiff clarifies the specific claims that relate to Good and Schacht in their individual capacities. Consequently, the Court reserves its ruling on these claims and DIRECTS the Plaintiff to submit a short brief within 10 days from receipt of this order specifying all claims against Good and Schacht, concerning Plaintiff's property and liberty interests, in their individual capacities. Defendants may respond, if necessary, within five days of Plaintiff's submission.

---

**57.** The Eleventh Amendment does not present a bar to section 1983 claims against state officials in their individual capacity. *Scheuer v. Rhodes*, 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1686–1697, 40 L.Ed.2d 90 (1974).

**58.** Contrary to Plaintiff's assertion, any action taken by Schacht and Good in their official capacities does not abrogate a qualified immunity defense since qualified immunity is not a defense official capacity claims.

**59.** Since Schacht and Good have raised the qualified immunity defense they have acknowledged that they were also sued in their individual capacities. *See Lundgren v. McDaniel*, 814 F.2d 600, 603–604 (11th Cir.1987) (defendants sued in personal capacity because they raised qualified immunity defense, which is inapplicable to official capacity suits).

**60.** *See* Complaint at ¶¶ 24–34.

**61.** Paragraphs 33 and 34 allege that Good acting as the agent of the PPC started his investigation before he received an official request to do so. The Court finds it difficult to determine if this is a claim against Good in his individual capacity or official capacity since Plaintiff is alleging that the agency exceeded its authority.

**B. CCSD & Purvis—Deprivation of Property**

Defendants CCSD and Purvis concede that Plaintiff had tenure in his teaching position. Defendants, however, argue that Plaintiff did not have tenure in his supplemental duty assignment as a coach. The Constitution itself does not create property interests. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "Rather they are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law ..." *Id.; Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Therefore, the first inquiry is whether Georgia's statutory scheme gave Plaintiff a property interest or legitimate claim of entitlement to his coaching position. *Hatcher v. Bd. of Public Educ.,* 809 F.2d 1546, 1551 (11th Cir. 1987).

### 1. Coaching Position

 Georgia law creates a property interest in continued employment for tenured teachers, i.e., one who accepts a school year contract for the fourth consecutive year from the same local board of education. *Hatcher,* 809 F.2d at 1550; O.C.G.A. § 20-2-942(b)(1). A tenured teacher may be demoted or not have his contract renewed for the reasons set forth in O.C.G.A. 20-2-940(a) pursuant to the procedural protections in O.C.G.A. § 20-2-942(b)(2), which requires that the teacher be given written notice of the board's intention and the right to be represented by counsel at a full hearing before the board. *Id.*

The Georgia appellate courts have not addressed the issue of whether or not a teacher

gains tenure in a supplemental duty position.[62] Therefore, the Court turns to the applicable statutory scheme to determine whether plaintiff had tenure in his position as head football coach. The Georgia Code refers to a teacher with a "contract for employment", O.C.G.A. § 20-2-940(a), and defines "school year contract" as "a contract of full-time employment between a teacher and a local board of education." O.C.G.A. 20-2-942(a)(3). In the instant case there is no evidence that Plaintiff had a written contract for his coaching position. The supplement he received for coaching was not included in his teaching contract. Consequently, the Court concludes that a coaching position, which is not guaranteed by a written contract for a definite term, falls outside the protection of the statute. *See Freeman v. Hinson,* No. C76-1351A (N.D.Ga.1977) (no property interest in position of department chairman).

Furthermore, the Georgia State Board of Education has consistently held that teaching contracts do not include supplemental duty positions. *See Copeland v. Clarke County Bd. Educ.,* Case No. 1988-43 (position of lead teacher), *aff'd,* J. Gaines, Civil Action No. SU-89-CV-0185 (Superior Court, Western Judicial Circuit, July 13, 1989); *Bonner v. Fulton County Bd. Educ.,* Case No. 1989-24 (State Bd. of Educ., Dec. 14, 1989) (no tenure in chairperson and coaching positions); *Arp v. Breman City Bd. of Educ.,* No. 1985-16 (State Bd. of Educ., Sept. 12, 1985) (O.C.G.A. § 20-2-942 applies only to position under which individual had a contract to perform).

Finally, the Court notes that a number of state and federal courts have concluded that teachers do not acquire tenure in coaching positions. *See, e.g., Lagos v. Modesto City Schools Dist.,* 843 F.2d 347 (9th Cir.), *cert.*

---

**62.** The authority on which Plaintiff relies, *Rockdale County School Dist. v. Weil,* 245 Ga. 730, 266 S.E.2d 919 (1980) and *Ellis–Adams v. Whitfield County Bd. of Educ.,* 182 Ga.App. 463, 356 S.E.2d 219 (1987), do not stand for the proposition that a teacher has tenure in his supplemental duty position. In *Ellis–Adams* the plaintiff was reassigned from her position as Language Arts Coordinator for the district to a classroom teacher position. The plaintiff in *Weil* was a school principal who had been reassigned to be the coordinator of an alternative school program.

Thus, in these cases, the plaintiffs already had tenure in their respective positions and the issue was whether a demotion, which would entitle them to a due process hearing, had occurred. Absent tenure, Plaintiff is not entitled to a due process hearing before being removed even if Plaintiff suffered a loss in prestige, pay and responsibility. Furthermore, *Holley v. Seminole County Sch. Dist.,* 755 F.2d 1492 (11th Cir.1985) is distinguishable from the instant case. Although the plaintiff in *Holley* coached football, he sued because his *teaching* contract was not renewed.

*denied,* 488 U.S. 926, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988); *Smith v. Bd. of Educ.,* 708 F.2d 258, 262 (7th Cir.1983); *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748 (5th Cir.1986), *modified on other grounds,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Slockett v. Iowa Valley Community Sch. Dist.,* 359 N.W.2d 446 (Iowa 1984); *Tate v. Livingston Parish Sch. Bd.,* 444 So.2d 219, 221 (La.App.1983); *School Directors of Dist. U–46 v. Kossoff,* 95 Ill.App.3d 26, 50 Ill.Dec. 550, 419 N.E.2d 658 (1981); *Maupin v. Indep. Sch. Dist.,* 632 P.2d 396 (Okla.1981); *White v. Banks,* 614 S.W.2d 331 (Tenn.1981); *Stang v. Indep. Sch. Dist.,* 256 N.W.2d 82 (Minn.1977); *Chiodo v. Bd. of Educ.,* 298 Minn. 380, 215 N.W.2d 806 (1974). As noted in *Tate,* "[w]hile such decisions are not controlling and can be distinguished on their facts, or on differences in the tenure acts or certification requirements, they are significant in their unanimity in denying tenure to coaches." 444 So.2d at 221. Consequently, the Court concludes that since Plaintiff did not have a property interest in his coaching position he was not entitled to a pre-termination hearing.

### 2. Teaching Position

■ Plaintiff also alleges that he was terminated from his teaching position without a hearing in violation of his due process rights. Defendant was entitled to a termination hearing if he was fired from his tenured teaching position. O.C.G.A. § 20–2–942(b)(2). Although he submitted his resignation, Plaintiff asserts that he was constructively discharged. Defendants, however, contend that there is no evidence, which would support a claim of constructive discharge, and that the evidence shows that the resignation was voluntary.

■ Constructive discharge is a mixed question of law and fact. *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1538 (11th Cir.1987). The test for constructive discharge is whether a reasonable person in the employee's position would have felt compelled to resign, *Downey v. Southern Natural Gas Co.,* 649 F.2d 302, 305 (5th Cir.1981), a question which the Court has the power to decide. *Shawgo v. Spradlin,* 701 F.2d 470,

481 n. 12 (5th Cir.1983); *see, e.g., Jurgens v. E.E.O.C.,* 903 F.2d 386, 391 (5th Cir.1990).

■ Defendant CCSD argues that the present case is analogous to *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748 (5th Cir.1986), *modified on other grounds,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). In *Jett* a high school teacher who was head football coach and athletic director at one high school was reassigned to teach and coach freshman football and track at another school. The Fifth Circuit concluded that the evidence was insufficient to support a claim of constructive discharge stating:

"Jett tendered his resignation ... stating that, after considering his assignment to Thomas Jefferson High School, he could not accept the position and felt 'forced to resign from the public education field with much sorrow and humiliation.' Jett argues that his significant loss in coaching responsibilities as well as the racial discrimination and the retaliation of his protected speech that prompted his reassignment amounted to a constructive discharge.

Although a demotion or transfer in some instances may constitute a constructive discharge, we find that Jett's loss of coaching responsibilities was not so intolerable that a reasonable person would have felt compelled to resign. We have noted that constructive discharge cannot be based on the employee's subjective preference for one position over another. [citation omitted] ... Moreover, the humiliation and embarrassment that [plaintiff] suffered are not significant enough to support a constructive termination. *See Shawgo,* 701 F.2d at 481–82 (publicity and derogatory comments resulting from disciplinary proceedings were not constructive discharge); *Junior [v. Texaco, Inc.,]* 688 F.2d 377, 380 (5th Cir.1982) (unfavorable work evaluations were not constructive discharge).

*Id.* at 755–56. The Court acknowledges that the instant action is distinguishable because Plaintiff's humiliation and emotional distress were produced both by the reason he lost the position, i.e., allegedly improper grade changes made by other teachers, which were approved by the guidance counselor and principal,[63] and by the loss of the position

---

**63.** After Purvis explained Plaintiff's options the

Plaintiff testified he said "I don't need to go back

itself. Unless extreme, however, loss of prestige, humiliation and embarrassment do not constitute a constructive discharge. *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977).

Furthermore, "[p]art of the employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." *Bourque v. Powell Electrical Mfg. Co*, 617 F.2d 61, 65 (5th 1980). The evidence shows that Brewer never returned to work after he was dismissed as head football coach. This case is distinguishable from the situation where a plaintiff is given the option of resigning or being fired. *See, e.g., Downey*, 649 F.2d 302 (5th 1981) (superior told older employee he might be discharged with consequent loss of benefits so plaintiff resigned). When Purvis informed Brewer that his request for leave had been denied he told Brewer that he could return to work, not report to work and be fired or resign.[64] Plaintiff was not given an either/or option. Rather, he was told that if he did not *return to work* he would be fired. Instead of reporting to work, Brewer called Purvis the next day and told him that he could not get a letter of resignation to him until Monday because his attorney was in court. Brewer subsequently submitted his resignation on March 26, 1990.

The facts of this case do not support a claim for constructive discharge. Cases in which summary judgment has been denied on this issue have involved intolerable working conditions while the plaintiff was on the job. *See, e.g., Stephens v. C.I.T. Group/ Equip. Financing, Inc.*, 955 F.2d 1023 (5th Cir.1992) (demoted plaintiff asked to train and to report to young successor, to explain his demotion and to introduce successor to defendant's biggest client, deprived of all supervisory responsibilities and pay cut); *Goss v. Exxon Office Systems, Co.*, 747 F.2d 885 (3d Cir.1984) (plaintiff's supervisor verbally abused her when she decided to become pregnant, assigned her sales territory to a man despite her success and gave her an ultimatum to accept her reassignment or resign when she pursued in-house remedies); *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227 (3d Cir.1988) (female excluded from management meetings and not permitted to order supplies even though males in her position had been allowed to do so, falsely accused of stealing and drinking on the job and had stolen goods placed in her locker to implicate her); *Mayer v. Brown & Root Constr. Co.*, 661 F.2d 369 (5th Cir.1981) (defendant transferred pregnant worker to position that would have endangered health of child). The Court does not think the Defendants' request that Plaintiff return to work imposed an intolerable work condition that would cause a reasonable person to resign. Furthermore, it was unreasonable for Plaintiff to refuse to return to work. Accordingly, Defendants CCSD's and Purvis's motion for summary judgment on the issue of due process in relation to Plaintiff's teaching and coaching positions are GRANTED.

## C. GHSA and Fordham

GHSA and Fordham argue that they are not state actors and did not deprive Plaintiff of any protected right or interest.

### 1. State Actors

The fourteenth amendment does not protect against private action, no matter how unfair that action may be. *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). "[T]he ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the fourteenth amendment: is the alleged infringement of federal rights 'fairly attributable' to the State?'" *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982) (quoting *Lugar v. Edmondson Oil*, 457 U.S. 922, 957, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

---

to that classroom. I'm not going to be able to do a good job in the classroom ... my hearts not in it ... I've been slandered and put down throughout this whole thing." Brewer Deposition. p. 101.

**64.** In his affidavit dated February 14, 1992, Plaintiff stated that Purvis told him that if he did not have his resignation on his desk the next morning he would be fired. This assertion contradicts Plaintiff's deposition testimony in which he stated that he was told he would be fired if he did not return to work.

State action is present in two sets of circumstances. First, state action is present where the "actor" is the "state itself, a state agency, a political subdivision of the state, or a public employee." *Newton v. Southeast Alabama Gas Dist.,* 708 F.Supp. 1254, 1257 (M.D.Ala.1989). Second, state action is also present where the actor is a private entity if it is deemed a state actor by virtue of its functions and its relationship with the state. *Id.* Traditionally, courts have found that high school athletic associations are state actors. *See Louisiana High School Athletic Ass'n v. St. Augustine High School,* 396 F.2d 224, 227 (5th Cir.1968); *Mitchell v. Louisiana High School Athletic Ass'n,* 430 F.2d 1155, 1157 (5th 1970); *Walsh v. Louisiana High School Athletic Ass'n,* 616 F.2d 152, 156, *reh'g denied,* 621 F.2d 440 (5th Cir.1980), *and cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981). Defendants, however, contend that since the Supreme Court's decisions in *Rendell–Baker* and *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the lower courts have unanimously held that such athletic associations do not act under color of law. The Court, however, notes that almost every case cited by the Defendants to support this assertion involves the National Collegiate Athletic Association, which is distinctly different from a high school athletic association as acknowledged by the Supreme Court in *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988).[65]

In *Tarkanian* the Supreme Court, in reaching its conclusion that the NCAA was not a state actor, stated "the source of the legislation adopted by the NCAA is not Nevada but the collective membership, speaking through the organization that is independent of any particular state." 488 U.S. at 193, 109 S.Ct. at 462. In a footnote the Supreme Court stated "[t]he situation would, of course, be different if the membership consisted entirely of institutions located within the same State, many of them public institutions created by the same sovereign." *Id.* n. 13 (*citing Clark v. Arizona Interscholastic Ass'n,* 695

F.2d 1126 (9th Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983); *Louisiana High School Athletic Assoc. v. St. Augustine High School,* 396 F.2d 224, 227 (5th Cir.1968)). Thus, an athletic association whose membership is predominated by institutions created by the same sovereign is a state actor. *See Libby v. South Inter–Conference Ass'n,* 728 F.Supp. 504, 507 (N.D.Ill. 1990). Consequently, the Court concludes that the Defendants are state actors.

### 2. Property Interest

Defendants next assert that the Plaintiff was not deprived of a federally protected right, privilege or immunity. Plaintiff contends that the Defendants denied him his property interest in his job.[66] Generally, cases in which the decisions or rules of a high school athletic association have been challenged have involved a student or a high school plaintiff. *See, e.g., Mitchell,* 430 F.2d at 1156; *Walsh,* 616 F.2d at 155, *St. Augustine High School,* 396 F.2d at 225. In this case, Plaintiff is challenging a decision that did not directly impact him. The GHSA's ruling was directed against Cedar Shoals High School. Plaintiff does not have a federally protected property interest in the games CSHS won. Even if, however, these defendants' actions affected Plaintiff's job as a coach or as a teacher, summary judgment is still appropriate since the Court has already concluded that Plaintiff did not have tenure in his coaching position and he was not deprived of his teaching position without due process of law. Consequently, GHSA's and Fordham's motion for summary judgment on Plaintiff's claim that he was deprived of his property interests without due process of law is GRANTED.

## II. DUE PROCESS DEPRIVATION OF LIBERTY

In *Roth v. Bd. of Regents,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) the Supreme Court stated that a plaintiff must allege either public disparagement

---

**65.** The other authority cited by Defendants, *Anderson v. Indiana High School Athletic Ass'n,* 699 F.Supp. 719 (S.D.Ind.1988), was decided before *Tarkanian.*

**66.** Plaintiff specifically contends that GHSA's decision caused him to lose his job and made him unemployable.

damaging to his standing in the community or a stigmatic injury in an employment interest likely to impair future work-related opportunities in order to invoke the procedural due process protection for a claim of injury to a liberty interest. The Eleventh Circuit standard for determining whether the deprivation of an individual's liberty interest has occurred requires a plaintiff to prove: (1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing. *Buxton v. Plant City*, 871 F.2d 1037, 1042 (11th Cir.1989).

### A. CCSD.

■ Brewer claims that the release of the PPC's investigative report to the public and press after the report had been presented by Hans Schacht at the CCSD meeting on February 1, 1990, deprived him of his liberty interest in his reputation without due process of law. CCSD, however, first argues that Plaintiff has not established the falsity element necessary to implicate his liberty interest. A review of the PPC's preliminary investigative report shows that it called Plaintiff's honesty into question, implied that he had previously been involved in grade changing incidents,[67] implied he took part in improper grade changes, attacked his leadership abilities and alleged he knew of the improper activities designed to gain eligibility for J.C.[68] The Hearing Tribunal Report[69] did not address the allegation that Plaintiff had been previously involved in grade changing incidents. Furthermore, the investigative report gave the impression that Plaintiff intentionally and actively sought to gain eligibility for J.C. by grade changes, which he knew to be improper. Although the hearing tribunal concluded that the actions were improper, it acknowledged that Clarke County School System did not have a formal written policy regarding grade changes at the time the changes were made and that CSHS's

principal had approved the grade changes. Therefore, after reading both documents in a light most favorable to the Plaintiff and drawing all reasonable inferences in his favor, *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir.1985), the Court concludes that the Plaintiff has presented evidence of a false statement in his claim against CCSD.

■ Next, CCSD contends that Plaintiff cannot establish the third element because he was not terminated from his teaching position. Damage to one's reputation, standing alone, is not protected by the Fourteenth Amendment Due Process Clause. *Emory v. Peeler*, 756 F.2d 1547, 1554 (11th Cir.1985) (*citing Paul v. Davis*, 424 U.S. 693, 700–02, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976)). Rather, "damage to reputation must be coupled with the denial of a more tangible interest, such as the loss of employment, to warrant the fourteenth amendment due process protection delivered by Section 1983." *Id.* Nevertheless, the liberty interest survives even if the plaintiff does not have a property interest in his position when statements are made in the context of a termination. *See, e.g., Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Campbell v. Pierce County*, 741 F.2d 1342 (11th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985).

While the Court agrees that Plaintiff was not terminated from his teaching position, it is disingenuous to suggest that he was not fired from his coaching position. The question is whether the termination of his coaching responsibilities is sufficient to invoke the due process protections of the fourteenth amendment. In *Campbell*, the plaintiff was an at-will employee who suffered damage to her reputation when the transcript from the Commissioner's meeting at which she was dismissed was published. Similarly, this Plaintiff had an at-will coaching contract with the Clarke County School District and the

---

**67.** The report states "Mr. Brewer's statements, which contain only partial and benign admissions, cannot be regarded as creditable [sic]. His statements lack persuasiveness all the more, since this present matter *is not an isolated incident in his career.*" Stroud Affidavit, Exhibit "E", at 20 (emphasis added).

**68.** Stroud Affidavit, Exhibit "E".

**69.** Stroud Affidavit, Exhibit "D".

PPC's investigative report was read at a CCSD meeting two days before he was discharged from his coaching position. Although *Campbell* is distinguishable because, unlike Brewer, the plaintiff in *Campbell* did not remain employed in any capacity; this Court concludes that CCSD's decision to relieve Plaintiff from his position as head football coach is significant enough to implicate his liberty interest.

In *Smith v. Bd. of Educ. of Urbana Sch. Dist. No. 116,* 708 F.2d 258 (7th 1983) and *Schneeweis v. Jacobs,* 771 F.Supp. 733 (E.D.Va.1991), the courts assumed, without deciding, that the plaintiffs had a liberty interest in their coaching positions even though they had not been terminated from their teaching positions. In *Smith* the plaintiffs were physical education teachers who were dismissed from their head coaching positions but retained in their teaching positions. In concluding that the plaintiffs were not stigmatized by the school board members statements, the Court stated that the Constitution required that the school board members "not make public statements so critical of plaintiff's coaching abilities that it would be virtually impossible for them *to find new employment in similar coaching positions."* *Smith,* 708 F.2d at 265 (emphasis added). In *Schneeweis* the district court held that a high school basketball coach's liberty interest in her reputation was not implicated when she was suspended because a temporary suspension was not an injury to employment.[70] Thus, both *Smith* and *Schneeweis* implicitly recognized that termination of the coaching position alone would satisfy the termination requirement.

The Court finds this reasoning sounder than the reasoning in *Diehl v. Albany County Sch.,* 694 F.Supp. 1534, 1538 (D.Wyo.1988), which held that a plaintiff whose high school basketball coaching contract was not renewed could not succeed on his liberty interest claim because he retained his teaching position and continued to coach at the junior high level, for three reasons. First, *Diehl* relied on *Danno v. Peterson,* 421 F.Supp. 950 (N.D.Ill.1976), which held that a plaintiff's liberty interest was not implicated when he was transferred from an administrative position to a teaching position. In contrast to the plaintiff in *Danno* who worked for the school board in one position and was reassigned to another, Brewer was employed by the school district in two distinct positions: as teacher and as head football coach. Plaintiffs have implicitly conceded this point in their arguments concerning Plaintiff's lack of tenure in his coaching position. Therefore, the present case is distinguishable from *Danno.*

> Second, in *Danno* the district court stated: The plaintiff in this action may well wish to seek other employment opportunities, however, he is still employed by the defendant school board. Whatever stigma may have been inflicted by the board in the allegedly defamatory remarks is greatly diminished by the simultaneous action of assigning him to the position of teacher and continuing his employment in that significant capacity ... the alleged stigma is minimized by his continued employment.

421 F.Supp. at 954. This Court does not see how any alleged stigma in the present case was diminished by the decision to retain Plaintiff in his teaching position. Plaintiff testified that he wanted to get back into coaching and that the jobs he looked for involved coaching positions.[71] Unlike the plaintiff in *Diehl* who retained other coaching responsibilities, however, Brewer was completely removed from coaching. If he desires to coach he is compelled to seek other employment and the statements made may have affected his employment opportunities. Schools actively recruit teachers to fill specific coaching positions. For example, Plaintiff testified that high schools in other counties tried to hire him to fill head football coach positions while he was coaching at CCHS.[72] Furthermore, the articles that appeared in the local Athens' newspaper when Plaintiff was hired demonstrate that he was primarily hired as a head football coach.[73] Thus, the

---

**70.** The district court also concluded that no stigmatizing statements had been made.

**71.** Deposition of Ken Brewer, p. 103.

**72.** Deposition of Ken Brewer, p. 106–109.

**73.** Plaintiff's Response to Defendant Clarke County School District's Motion for Summary Judgment, Exhibit A.

stigma attached to Plaintiff's conduct as a coach is not minimized by his continued employment as a teacher. Accordingly, for the reasons discussed, the Court concludes that there was a termination of employment.

Finally, Defendant CCSD argues that even if the statements were made in an employment termination context Plaintiff had an opportunity to clear his name at the PPC hearing. *Buxton* indicates that the *governmental employer* must provide a meaningful opportunity for a name-clearing hearing. 871 F.2d at 1042. CCSD never provided Plaintiff with any opportunity to clear his name.

Moreover, even if the PPC hearing could cure CCSD's failure to provide a hearing, Plaintiff has provided evidence that the hearing was not provided at a meaningful time. Hearings granted in cases in which a liberty interest involving reputation is implicated serve to allow the employee to clear his name. *Buxton*, 871 F.2d at 1046. " '[T]he hearing need not take place prior to [the employee's] termination or to the publication of related information adverse to his interests.' " *Id.* (*quoting Campbell*, at 1345). Thus, the name-clearing hearing did not have to be provided before the termination. Nonetheless, Defendants' argument assumes that so long as a name-clearing hearing is eventually provided, due process is not violated. The Court disagrees.

▮ Due process requires that a hearing be held at a meaningful time. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). In *Campbell* the Eleventh Circuit implied that due process was violated when "a substantial amount of time elapsed between the claimant's termination and the 'name-clearing' hearing." *Campbell*, at 1346 (plaintiff could not prevail on her claim for damages under § 1983 because she had been provided with a constitutionally adequate name-clearing hearing within 14 days of her dismissal); *see also Endicott v. Huddleston*, 644 F.2d 1208, 1216–17 (7th 1980) (three year delay in providing name-clearing hearing could give rise to compensable damages).[74] In this case the PPC's hear-

ing for the Plaintiff was over one year and four months after he was relieved of his head coaching responsibilities, and four months after he filed suit. While Plaintiff did not have to wait as long as the plaintiff in *Endicott*, he certainly had to wait longer than the plaintiff in *Campbell*. Therefore, the Court concludes that Plaintiff has provided evidence on the sixth element of a liberty interest claim. Accordingly, CCSD's motion for summary judgment on Plaintiff's liberty interest claim is DENIED.

**B. Purvis**

▮ Defendant Purvis also contends that he never made a false statement concerning Plaintiff. Purvis admits that his recommendation to relieve Brewer of his coaching responsibilities was based on the PPC investigative report, the CCSD Internal Task Force Report, and the GHSA's ruling. Plaintiff, however, has not directed the Court to any specific false statements made by Purvis. Rather, Plaintiff appears to contend that Purvis' recommendation in and of itself stigmatized him. The mere act of recommending Plaintiff's dismissal does not implicate Plaintiff's liberty interest. *See Lagos v. Modesto City Schools Dist.*, 843 F.2d 347 (9th Cir.1988) (plaintiff not stigmatized by school board's decision not to renew his coaching contract). Consequently, the Court concludes that Plaintiff has failed to establish that Defendant Purvis made a false statement. Consequently, Purvis' motion for summary judgment on this issue is GRANTED.

**C. GHSA and Fordham**

▮ Plaintiff also claims that the decision rendered by Fordham implicated his liberty interest in his reputation. The Court concludes, however, that Plaintiff has not established that the statements in the ruling were made in the context of a termination. In *Campbell*, the transcript from the Commissioner's meeting at which she was dismissed was published. In contrast, the GHSA's rul-

---

74. The court said that the plaintiff could recover for the cost of his attorney's fees in getting the second hearing through the mandamus action in state court. The court further noted that the

plaintiff would "have been entitled to recover damages for injury to his reputation between the time he was denied due process and the time of the second hearing." *Endicott*, at 1217.

ing was issued months before Plaintiff was removed from his coaching position. Consequently, the ruling did not implicate Plaintiff's liberty interest in his reputation. Accordingly, Defendants GHSA's and Fordham's motion for summary judgment on Plaintiff's liberty interest claim is GRANTED.

## STATE LAW CLAIMS

Brewer claims that the Defendants libeled him in violation of O.C.G.A. § 51–5–1. "A libel is a false and malicious defamation of another expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.G.C.A. § 51–5–1(a). In order to recover for a libelous statement the statement must be published. O.G.C.A. § 51–5–1(b).

## I. CCSD

Plaintiff claims he was libeled presumably by CCSD's distribution of the PPC's Investigative Report at a public meeting of the School Board. Summary judgment is appropriate since Plaintiff failed to respond to CCSD's argument on this issue. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077 (11th Cir.1990) (non-moving party bears burden of coming forward with sufficient evidence on each element that must be proved).

Furthermore, the Court notes that the statute of limitation had passed when this action was filed. The applicable statute of limitation to Plaintiff's claim for damage to his reputation is one year. *Wiggins v. Citizens & Southern Nat. Bank*, 173 Ga.App. 761, 328 S.E.2d 222 (1985); O.C.G.A. § 9–3–33. The evidence shows that the PPC's investigative report was distributed on February 1, 1990. Brewer's complaint was filed on February 7, 1991, which was outside the statute of limitations. Consequently, his claim is time barred. Accordingly, CCSD's motion for summary judgment on the issue of libel is GRANTED.

## II. Purvis

Plaintiff fails to identify how Dr. Purvis libeled or slandered him. The Court assumes that Plaintiff's contention is that the Purvis' action in recommending that Plaintiff be terminated defamed the Plaintiff. Plaintiff has not pointed this Court to any authority that would support his argument. Consequently, summary judgment in favor of Dr. Purvis is GRANTED. *See Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## III. GHSA

Plaintiff's allegation of defamation in the GHSA's ruling is based on the inclusion of language regarding Plaintiff's knowledge of the grade changes. In order to recover for a libelous statement the statement must be published. O.G.C.A. § 51–5–1(b). Generally, publication occurs when the libel is communicated to anyone other than the person libeled. *Kurtz v. Williams*, 188 Ga.App. 14, 15, 371 S.E.2d 878, 880 (1988); O.G.C.A. § 51–5–3. Georgia courts, however, have carved an exception to the general rule, which provides that "when the communication is intracorporate, or between members of unincorporated groups or associations, and is heard by one who, because of his/her duty or authority has reason to receive the information, there is no publication of the allegedly slanderous material." *Id.*

As Executive Director of the GHSA, Mr. Fordham had an obligation to communicate his findings to Superintendent Purvis. Even if the decision eventually was made public by others, there is no evidence that the GHSA or Fordham disseminated the ruling to anyone else. Consequently, there was no publication.

Furthermore, even if there was publication, the statute of limitation on this particular instance of publication has expired. The evidence shows that the ruling was transmitted to Dr. Purvis on November 10, 1989. This action was filed on February 7, 1991, which is outside the one year limit. *See Wiggins*, 173 Ga.App. 761, 328 S.E.2d 222 (1985); O.G.C.A. § 9–3–33. Plaintiff, however, contends that Fordham's interview with Don Farmer kept the statutory period for defamation open until September 1991. The Court disagrees.

The statute of limitation runs from the date of publication. Each publication of a libelous matter constitutes a separate cause of action. *Western Union Tel. Co. v. Vickers*, 71 Ga.App. 204, 209, 30 S.E.2d 440, 443

**1580**

(1944). Thus, the interview with Don Farmer is a separate incident giving rise to a separate claim for defamation. Accordingly, Defendant's motion for summary judgment on Plaintiff's claim for defamation related to the GHSA ruling is GRANTED.

## IV. Fordham

■ Plaintiff claims William Fordham's statements to Don Farmer were defamatory under O.G.C.A. § 51–5–1. Defendant Fordham contends that he was merely stating an opinion and opinions are not actionable. Defendant relies on *S & W Seafoods Co. v. Jacor Broadcasting of Atlanta*, 194 Ga.App. 233, 390 S.E.2d 228 (1989), to support his contention. *S & W Seafoods*, however, relied on dictum from *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), in reaching its conclusion. In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990), the Supreme Court stated that *Gertz* did not create a "wholesale defamation exemption for anything that might be labelled opinion" and held that some opinions were actionable. Thus, some opinions are actionable under the law of defamation. The question is whether the opinion stated by Mr. Fordham is actionable.

In *Milkovich* the Court set forth a two-pronged test to determine whether or not an opinion was entitled to protection. First, this Court must determine whether a reasonable fact finder could conclude that a statement implied a defamatory assertion. 497 U.S. at 21, 110 S.Ct. at 2707. If the answer is "yes", then the district court must determine whether the defamatory assertion is factual enough to be proved true or false. *Id.* If it cannot be proved true or false then the opinion is constitutionally protected. The Court concludes that the test has been met. Consequently, Defendant Fordham's motion for summary judgment on these statements is DENIED.

### CONCLUSION

Accordingly, for these reasons stated above, Defendant CCSD's motion is GRANTED IN PART and DENIED IN PART. Defendant Purvis's motion is GRANTED. Defendants GHSA's and William Fordham's motion is GRANTED IN PART and DENIED IN PART. Plaintiff's claim against the PPC, and Schacht and Good in their official capacities is REMANDED to the Superior Court of Clarke County. The Court reserves its ruling on claims against Good and Schacht in their individual capacities.

SO ORDERED.